## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *EDWARD LUND,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 2:14-cv-225-JHR* |
| | ) | |
| *ERIC McCUSKER,* | ) | |
| | ) | |
| *Defendant* | ) | |

## MEMORANDUM DECISION AND ORDER
## ON MOTION FOR SUMMARY JUDGMENT[1]

The defendant, Portland Police Officer Eric McCusker, moves for summary judgment on the sole remaining claim against him by plaintiff Edward Lund, for the use of excessive force in violation of the Fourth Amendment of the United States Constitution during the detention and arrest of Lund on September 19, 2012.  *See* Officer McCusker's Motion for Summary Judgment ("Motion") (ECF No. 32) at 1.[2]  For the reasons that follow, the Motion is denied.

### I.  Applicable Legal Standards

#### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *Ahmed v.*

---

[1] The parties have consented to have me conduct all proceedings in this matter, including the entry of judgment. ECF No. 14.

[2] Two plaintiffs, Lund and Jeffrey Staples, initially pressed four claims against McCusker, for violation of 42 U.S.C. § 1983 (Count I), negligence (Count II), wanton and oppressive force in violation of 15 M.R.S.A. § 704 (Count III), and assault and battery (Count IV).  *See* Complaint (ECF No. 1) ¶¶ 41-58.  The parties stipulated to the dismissal with prejudice of Counts II, III, and IV, *see* ECF No. 11, and of all remaining claims by Staples, *see* ECF No. 18. The remaining section 1983 claim alleges violations of the rights to be free from unreasonable search and seizure, to exercise free speech, and not to be deprived of life, liberty, or property without due process of law.  *See* Complaint ¶ 43.  However, McCusker construes the claim to be predicated solely on his alleged use of excessive force in violation of the Fourth Amendment, *see* Motion at 1, and Lund does not dispute that characterization, *see* Plaintiff's Response to Defendant's Motion for Summary Judgment ("Opposition") (ECF No. 34) at 5-6, 18.

*Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id*. (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are

not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id.*  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II.  Factual Background

There is no dispute between the parties as to a majority of the facts set forth in their statements of material facts, many of which I find unnecessary to set forth herein.  I have resolved disputes in favor of Lund as the nonmovant.  I have assumed that statements that are "qualified" are admitted subject to the qualification, unless the qualification indicates otherwise.

### A.  Officers Respond to Scene of Suspected Burglary

On September 19, 2012, Zachary Carleton, a security contractor performing anti-burglary surveillance at the Central Maine Power ("CMP") premises on Canco Road in Portland, saw two men walk from an adjacent parking lot and cut through a fence line area near the CMP facility. [Defendant's SMF], commencing on page 1 of Plaintiff Edward Lund's Reply to Defendant Eric McCusker's Responses to Plaintiff's Additional Statements of Material Facts ("Unified SMF") (ECF No. 38), ¶¶ 24, 58; Plaintiff's Response ("Plaintiff's Opposing SMF"), commencing on page 1 of Unified SMF, ¶¶ 24, 58.  The two males were walking in an area between two fence lines, one of which ran along the CMP property and the other of which ran along Brockway Smith opposite CMP, with a railroad track and grassy area in between.  *Id*. ¶ 59.

CMP had arranged for overnight surveillance of its facility because it had a long history of copper thefts, including a massive break-in during the summer in which entry was gained through the fence line.  *Id.* ¶ 55.  Reels of copper were outside in plain view at the CMP facility, and Carleton was positioned in order to protect CMP from copper thefts.  *Id*. ¶ 57.  Carleton, who suspected that the men were going to enter the CMP facility, requested police assistance. *Id.* ¶¶ 58, 64.

McCusker and fellow Portland Police Officer Christian Stickney, each of whom had been employed by the Portland Police Department for more than 10 years, quickly responded upon

4

receiving a call from dispatch after 10 p.m. reporting suspicious persons in the area of the CMP premises on Canco Road. *Id.* ¶¶ 10, 18, 64, 66. Stickney, who had been a police canine handler since 2008, brought with him his police canine Taz, a large Malinois Belgian shepherd dog weighing about 70 pounds. *Id.* ¶¶ 19-21, 72. Sergeant Eric Nevins also was dispatched to CMP to assist and supervise McCusker and Stickney. *Id.* ¶¶ 22, 67. Because there had been copper thefts from CMP, Nevins, McCusker, and Stickney all believed that they were responding to a burglary in progress, which is a felony offense. *Id.* ¶ 69. McCusker believed that it was possible that others, besides the two men whom Carleton had observed, were involved. *Id.* ¶ 76.

After McCusker and Stickney arrived at CMP, Stickney secured Taz in his police car, and the officers began a vigilant and cautious search for the two men in the alley between the two chain-line fences. *Id.* ¶¶ 71, 78, 82. The area was not typically traveled or used for business purposes, was dark, was unpaved, and had heavy vegetation, including tall grass, and some terrain hazards. *Id.* ¶¶ 79-80.

The location at the fence line where Carleton had spotted the two men was not well-illuminated, and it was an easy place for someone to get through or over the fence. *Id.* ¶ 74. Even though McCusker used a flashlight during the search, he could not see anything because the vegetation was too thick. *Id.* ¶ 84. The situation was problematic tactically because the officers were operating in an area contained by eight-foot chain-link fences on either side, with only two ways out of the area, either in the direction from which they had walked or in the direction they were searching. *Id.* ¶ 81. McCusker did not feel safe because he suspected that the suspects could be hiding in the alleyway, and the terrain created good opportunities to hide. *Id.* ¶ 83.

Stickney decided to return to the patrol car to get Taz. *Id*. ¶ 85. McCusker was alone and exposed in the alleyway during that interval but continued to check the area near him as Stickney and Taz, on whom Stickney had placed a harness attached to a long leather lead, walked toward him. *Id*. ¶¶ 86, 88. In the meantime, Lund and Staples had walked down the railroad tracks and "dove into the bushes" when they saw a set of car headlights pull into the area. Defendant's SMF ¶ 89; Deposition of Edward Lund ("Lund Dep.") (ECF No. 33-1), attached to ECF No. 33, at 90, 92.[3] They saw two pairs of legs pass by them three times, the last time with a police canine. Defendant's SMF ¶ 91; Plaintiff's Opposing SMF ¶ 91.

## B.  Suspects Are Discovered

As Stickney approached McCusker, Taz pulled him toward some bushes, where he found Lund and Staples lying on the ground hiding, face-down and head-to-toe, parallel to the Brockway Smith chain-link fence. *Id*. ¶ 95. The ground surface in the area where Lund and Staples were hiding was grass, dirt, and gravel. *Id*. ¶ 90. Stickney and McCusker had reasonable concerns for their safety when they found Lund and Staples prone and hiding during the night of September 19, 2012. *Id*. ¶ 97.

After Taz discovered the men, Stickney, perceiving a threat, followed his training protocol and commanded Taz to "watch" the suspects, which involves barking, and shouted commands for the men to show their hands, advising that the police canine would bite them if they did not follow instructions. *Id*. ¶ 98. The two men remained immobile and did not resist after Stickney gave them instructions. *Id*. ¶ 99. When McCusker heard Stickney giving verbal commands, he immediately ran toward him. *Id*. ¶ 100. Using his flashlight, McCusker illuminated two Caucasian adult males lying head to toe in a line against the Brockway Smith

---

[3] Lund denies this, but his denial is in the nature of a qualification: that, despite his use of the word "dove," what he meant was not that he and Staples literally dove but, rather, "ran over and ducked down, laid down." Plaintiff's Opposing SMF ¶ 89; Lund Dep. at 92.

fence, covered in vegetation, and he noticed that one of the suspects was partially obscured by a bush, shrub, or tree.  *Id*. ¶ 101.

After Stickney instructed the suspects to show their hands to make sure that they had nothing in them, McCusker told Staples not to move and then to put his hands behind his back. *Id*. ¶ 105.  Although the suspects were in a closed-in area that made displaying their hands difficult, they showed their hands, allowing the officers to verify that they had nothing in them. *Id*. ¶ 106.  McCusker did not know whether the two suspects had placed their hands underneath them in order to hide something before he got to their location.  *Id*. ¶ 107.

Although Lund and Staples had been detained, Stickney and McCusker believed that they posed a viable threat since they had only just been located, and prone suspects pose unique officer-safety risks because some areas are not visible to the officer, including the area under the belly, and there are many unknowns.  *Id*. ¶ 108.  Despite the presence of a police canine handler, there is an inherent risk to an officer responsible for handcuffing and searching two suspects because the canine officer cannot release the dog to help the other officer unless the nature of the threat justifies the use of the dog.  *Id*. ¶ 109.  After detaining Lund and Staples, Stickney's role was to handle Taz, and McCusker was responsible for handcuffing each of the two hiding suspects, which posed officer-safety concerns.  *Id*. ¶ 110.  Attempting to handcuff two suspects one-at-a-time can be challenging because the officer must be concerned about the possibility that the second suspect may attack him or her.  *Id*. ¶ 111.

Because there were two suspects, Stickney and Taz took up a cover position on Lund while McCusker handcuffed Staples and then switched positions when McCusker moved to handcuff Lund.  *Id.* ¶ 112.  Stickney could not hear anything that McCusker and the suspects

might have said because Taz was barking so loudly, although he did not hear any yelling when McCusker was handcuffing the suspects.  *Id*. ¶ 113.

Except for hiding in the bushes before they were detained, Lund and Staples were compliant and did not resist arrest, attempt to escape, or threaten the officers.  *Id*. ¶ 114.  Lund claims that McCusker violently, unjustifiably, and purposefully attacked him while he was handcuffed, fracturing Lund's rib as a consequence of McCusker's alleged brutality.  *Id*. ¶ 1.[4]

### C.  McCusker Allegedly Injures Lund

Upon encountering the suspects hiding in the tall grass, McCusker took complete charge and "lost his mind."  Plaintiff's Additional Statements of Material Fact ("Plaintiff's Additional SMF"), commencing on page 84 of Unified SMF, ¶ 208; Plaintiff Edward Lund's Answers to Defendant's Interrogatories ("Lund Interrog. Ans.") (ECF No. 34-1), attached to Opposition, ¶ 12.  McCusker said, "[D]on't f_ _king move, assholes.  My partner's got the K-9 on you.  You f_ _king move he's going to let him go and he'll chew the skin off your f_ _king faces, you understand assholes."  Plaintiff's Additional SMF ¶ 209; Lund Interrog. Ans. ¶ 12.  The two suspects said, "[W]e're not moving."  Plaintiff's Additional SMF ¶ 210; Lund Interrog. Ans. ¶ 12.

McCusker dealt with Staples first because he was easier to access than Lund.  Defendant's SMF ¶ 117; Plaintiff's Opposing SMF ¶ 117.  Staples was lying face down when he was discovered, and McCusker handcuffed him while he was still prone facing down and then

---

[4] McCusker offers a sharply contrasting version of events following his handcuffing of the suspects, Defendant's SMF ¶¶ 103-04, 116, 119, 121, 134-39, 146-50, 152-54, which Lund denies, Plaintiff's Opposing SMF ¶¶ 103-04, 116, 119, 121, 134-39, 146-50, 152-54.  McCusker objects to those denials on the bases that they fail to controvert the underlying facts in whole or in part and/or are based on speculative, argumentative, and/or conclusory statements by Lund.  Officer McCusker's Reply ("Defendant's Resp. to Opposing SMF"), commencing on page 1 of Unified SMF, ¶¶ 103-04, 116, 119, 121, 134-39, 146-50, 152-54.  The objections are overruled.  Lund's denials are predicated, in the main, on competent evidence – his testimony as to specific facts that he claims to have perceived.  While the denials may not controvert every detail of the underlying statements, in broad brush, they suffice to controvert McCusker's version of events.  The details that they do not controvert are immaterial to this decision.

moved him to a place where he could search him since he was up against the fence and partially covered. *Id.* ¶ 118.

Once Staples was handcuffed behind his back and searched, Stickney and McCusker changed positions so that McCusker could deal with Lund, who was also handcuffed behind his back. *Id.* ¶ 122. Although Staples had been more visible, Lund was lying face down up against the fence on thick grass, which was about a foot deep, with his head completely concealed underneath a bush. *Id.* ¶ 123. McCusker had to squat in order to handcuff Lund because the bush prevented him from getting too close to him. *Id.* ¶ 124. When handcuffing Lund, McCusker's knees, which were in the area of Lund's thigh and buttocks, did not touch Lund's body. *Id.* ¶ 125. McCusker used Stickney's handcuffs to secure Lund because he had used his own on Staples. *Id.* ¶ 126. Lund was handcuffed without incident within a few minutes after Stickney found him hiding. *Id.* ¶ 127. Lund's handcuffs were located above his buttocks and slightly below his waistline. *Id.* ¶ 128. Lund did not voice any complaint before McCusker searched him. *Id.* ¶ 129.

After handcuffing Lund in the fence area, McCusker grabbed his feet and pulled him backwards from under the bush and then pulled him by the left shoulder away from the fence, moving him a distance of about three feet to an area with tall grass so that McCusker would have enough access to Lund to search him. *Id.* ¶ 130. After McCusker moved Lund about one or two feet away from the fence, Lund was perpendicular to the fence so that his feet were closest to the fence and his shoulder/triceps area was furthest from the fence, which gave McCusker enough room to maneuver. *Id.* ¶ 131. Like Staples, Lund was prone, his hands were handcuffed behind his back, and he was facedown when McCusker searched him. *Id.* ¶ 132. Lund did not see what McCusker did because he was lying face down looking at the ground. *Id.* ¶ 133.

McCusker told the suspects that they were going to be charged with criminal trespassing. Plaintiff's Additional SMF ¶ 211; Lund Interrog. Ans. ¶ 12.  Lund said that people walk these tracks every day.  Plaintiff's Additional SMF ¶ 212; Lund Interrog. Ans. ¶ 12.[5]  At that point the other officer shone his flashlight and observed wire cutters on the other side of the chain-link fence, stating, "[W]hat have we got here?"  Plaintiff's Additional SMF ¶ 213; Lund Interrog. Ans. ¶ 12.[6]  The suspects gave their names and dates of birth, and Staples told the officers that he was on probation with Barbara Nichols.  Plaintiff's Additional SMF ¶ 214; Defendant's Reply SMF ¶ 214.[7]

Lund heard a smack and heard Staples say, "[W]hat the f_ _k did you punch me in the face for."  Plaintiff's Additional SMF ¶ 216; Lund Interrog. Ans. ¶ 12.  Lund looked back and saw that Staples' hat was turned down so that he could not see.  Plaintiff's Additional SMF ¶ 217; Lund Interrog. Ans. ¶ 12.  Lund heard McCusker ask if he wanted some more.  Plaintiff's Additional SMF ¶ 218; Lund Interrog. Ans. ¶ 12.  Staples said something, and McCusker responded, "[S]hut the f_ _k up or I'll cave your f_ _king face in."  Plaintiff's Additional SMF ¶ 219; Lund Interrog. Ans. ¶ 12.  Staples was spitting something out of his moth.  Plaintiff's Additional SMF ¶ 220; Lund Interrog. Ans. ¶ 12.  Lund did not know at the time that Staples' tooth had been broken.  *Id.*

---

[5] McCusker qualifies this statement, asserting that Lund and Staples admittedly lied to police officers at the outset of the encounter by saying that they had merely been walking along the railroad tracks.  Defendant's Response ("Defendant's Reply SMF"), commencing on page 84 of Unified SMF, ¶ 212; Lund Dep. at 99-102.

[6] McCusker qualifies this statement, asserting, in relevant part, that there was enough space between the ground and the bottom of the chain-link fence that Lund and/or Staples could have pushed the cable cutters under the fence, and Staples pled guilty to the criminal offense of possession of burglars' tools in connection with his arrest on September 19, 2012.  Defendant's Reply SMF ¶ 213; Deposition of Eric McCusker ("McCusker Dep.") (ECF No. 43-1), attached to ECF No. 43, at 67, 79-80, 95.

[7] Lund does not make clear when the conversation described in paragraphs 211 through 214 is alleged to have transpired, but its timing is immaterial to the resolution of the Motion.

Lund then heard McCusker say, "[W]e'll deal with you."  Plaintiff's Additional SMF ¶ 221; Lund Interrog. Ans. ¶ 12.[8]  This was followed by "a wicked blow" to the left side of Lund's spine.  Plaintiff's Additional SMF ¶ 223; Lund Interrog. Ans. ¶ 12.  So much force and weight hit Lund near his spine that it squished everything on that side and blew the breath right out of his body.  Plaintiff's Additional SMF ¶¶ 224-25; Lund Interrog. Ans. ¶ 12.[9]  "It hurt so bad."  Plaintiff's Additional SMF ¶ 226; Defendant's Reply SMF ¶ 226.  Lund told McCusker, "[Y]ou broke my f_ _king ribs, I want a f_ _king ambulance."  *Id.*[10]  McCusker replied, "[I]f I broke your ribs you wouldn't be yelling like that."  *Id.* ¶ 227.[11]  Lund said, "[D]ude, you broke my f_ _king ribs, I want an ambulance right now."  *Id.* ¶ 228.  McCusker acted like Lund wasn't even talking to him.  Plaintiff's Additional SMF ¶ 229; Lund Interrog. Ans. ¶ 12.  Lund told McCusker, "[Y]ou're all done.  I'm calling my lawyer and suing you."        Plaintiff's Additional

---

[8] McCusker denies paragraphs 215 through 218 and 220-21 in part on the basis that Lund's testimony is inadmissible pursuant to Federal Rule of Evidence 602 because he lacks personal knowledge, having admitted that he did not see the punch and that he earlier falsely stated that he had.  Defendant's Reply SMF ¶¶ 215-18, 220-21; Lund Interrog. Ans. ¶ 12; Lund Dep. at 49-50.  I sustain the objection as to paragraph 215 and that portion of paragraph 216 stating that McCusker punched Staples, an occurrence that Lund admits he did not see, but otherwise overrule it.  Lund is competent to testify as to what he perceived, including what he heard.  A trier of fact crediting that testimony could infer that McCusker punched Staples.

[9] McCusker denies paragraphs 222 through 225 in part on the basis that they constitute speculation, particularly insofar as Lund claims that McCusker administered a "knee strike," and are unsupported by the record, which unmistakably reflects that Lund did not see what McCusker was doing.  Defendant's Reply SMF ¶¶ 222-25.  Treating this as an objection, I sustain it as to paragraph 222 and those portions of paragraphs 224 and 225 stating that McCusker used his knee or a knee strike, and otherwise overrule it.  Lund is competent to testify as to what he perceived, including what he heard and felt.  A trier of fact crediting that testimony could infer that McCusker delivered a knee strike to the left side of Lund's body.

[10] McCusker qualifies this statement, admitting that Lund complained of pain, complained that McCusker was breaking his back, requested an ambulance, and used profanity.  Defendant's Reply SMF ¶ 226; Plaintiff's Reply ("Plaintiff's Resp. to Reply SMF"), commencing on page 85 of Unified SMF, ¶ 226.  McCusker recalls that Lund told him that he (McCusker) was breaking his back, not his ribs, during the search process, although other witnesses recall that Lund was complaining about his ribs.  *Id.*  In addition, after McCusker completed his search of Lund, Lund said he wanted an ambulance and told McCusker that he was going to sue him.  *Id.*

[11] McCusker qualifies this statement, asserting that he does not recall saying anything along the lines of, "If I broke your back, you wouldn't be able to walk like that[,]" although it is possible that he said something like that.  Defendant's Reply SMF ¶ 227; Plaintiff's Resp. to Reply SMF ¶ 227.

SMF ¶ 230; Defendant's Reply SMF ¶ 230.[12]  McCusker replied, "[G]et in line." *Id.* ¶ 231.[13]

When Carleton got to within 25 to 35 yards from where the police officers had engaged the two suspects, he could not see anything because of the dark lighting conditions but could hear a dog barking and some yelling.  Defendant's SMF ¶ 140; Plaintiff's Reply SMF ¶ 140. Carleton heard someone hollering, "My ribs, my ribs!"  *Id.* ¶ 141.[14]  Carleton sensed that the suspect yelling about his ribs was merely hollering at the officer rather than screaming in pain. *Id.* ¶ 142.[15]  He had the impression that the individual hollering about his ribs was pretending to be in pain. *Id.* ¶ 143.[16]

Carleton also testified that he could overhear an officer threatening to "cave your f_ _king face in."  Plaintiff's Additional SMF ¶ 248; Defendant's Reply SMF ¶ 248.[17]  Carleton was surprised to learn that neither of the officers said that either of the suspects resisted in any way because he assumed that the remark, "I'll cave your f_ _king face in," was designed to overcome resistance to arrest.  *Id.* ¶ 249.[18]  McCusker denied making the statement that he would

---

[12] McCusker qualifies this statement, asserting that, during the period in which he had contact with Lund, Lund continued to threaten to sue him and to request medical attention.  Defendant's Reply SMF ¶ 230; Plaintiff's Resp. to Reply SMF ¶ 230.

[13] McCusker qualifies this statement, asserting that he may have said, "Get in line," as a sarcastic response to Lund's threat to sue him, although he does not recall making that statement.  Defendant's Reply SMF ¶ 231; Plaintiff's Resp. to Reply SMF ¶ 231.

[14] My recitation incorporates Lund's qualification.

[15] Lund qualifies this statement, asserting that Carleton "didn't know if [the suspect] was hurt or not.  I just heard him screaming my ribs."  Plaintiff's Opposing SMF ¶ 142; Defendant's Resp. to Opposing SMF ¶ 142.

[16] Lund qualifies this statement, asserting that, while Carleton told an Internal Affairs investigator that he believed the person was pretending to be in pain, he later said that he did not know if he was hurt or not.  Plaintiff's Opposing SMF ¶ 143; Deposition of Zachary Carleton ("Carleton Dep.") (ECF No. 33-4), attached to ECF No. 33, at 17, 33. McCusker's objection to this qualification on the ground that it is beyond the scope of the asserted fact, Defendant's Resp. to Opposing SMF ¶ 143, is overruled.

[17] McCusker qualifies this statement, asserting that Carleton testified that what he overheard was "an unmistakable instruction to d[e]fuse the situation," based on his experience and training as a military police officer.  Defendant's Reply SMF ¶ 248; Carleton Dep. at 25.  Lund rejoins that Carleton also testified that he was "not sure if he [the officer] meant violence or he was just simply stating it to the individual on the ground."  Plaintiff's Resp. to Reply ¶ 248; Carleton Dep. at 23-24.

[18] McCusker qualifies this statement, asserting that Carleton agreed with the proposition that it is necessary to give instructions that are unmistakable to individuals who may pose a danger to an officer, and he (Carleton) had encountered dangerous individuals in his capacity as a military police officer and used profanity to get those

"cave your f_ _king face in."  *Id.* ¶ 250.  Carleton was not in a position to see any contacts between the police officers and Lund and Staples.  Defendant's SMF ¶ 144; Plaintiff's Opposing SMF ¶ 144.

Stickney, who was with McCusker when McCusker handcuffed and searched Staples and Lund, never saw McCusker use excessive force, and he would have intervened had he seen such misconduct and reported it to a superior officer.  *Id.* ¶ 156.  Stickney did not see anything indicating that McCusker was not in control of himself during the incident involving Staples and Lund.  Defendant's SMF ¶ 157; Stickney Dep. at 61.[19]

Nevins was in charge of the scene as soon as he was assigned to the call on September 19, 2012.  Defendant's SMF ¶ 163; Plaintiff's Opposing SMF ¶ 163.  In that role, he coordinated activities by radio.  *Id.* ¶ 164.  He arrived at the scene within a minute or two of hearing McCusker's broadcast that two suspects had been detained and found a calm situation in which McCusker and Stickney were concentrating on documenting the events that had transpired, although he heard Taz barking and Lund yelling.  *Id.* ¶¶ 165-68.  Nevins asked what was going on, and Lund told him that McCusker had broken his rib.  *Id.* ¶¶ 169-70.  Nevins requested a MEDCU ambulance, and then conducted an investigation into Lund's claim.  *Id.* ¶ 170.

### D.  Lund Receives Medical Evaluations

Paramedic Edward Dexter and Emergency Medical Technician ("EMT") Corey Morin were dispatched at 10:52 p.m. to assist Lund, and arrived on the scene at 10:57 p.m.  *Id.* ¶¶ 28, 183.  Upon arrival, Dexter and Morin determined that Lund was a 38-year-old male who was conscious and alert, handcuffed, and sitting up on the back of a truck.  *Id.* ¶ 185.  Dexter

---

[19] Lund denies this statement, but his assertion is in the nature of a qualification: that Stickney was not "focused on what . . . McCusker was doing at that point in time[.]"  Plaintiff's Opposing SMF ¶ 157; Stickney Dep. at 61.

Individuals' attention, not as a reflection of his intention to use violence.  Defendant's Reply SMF ¶ 249; Carleton Dep. at 22-23.

performed an on-scene medical evaluation of Lund at Nevins' request. *Id*. ¶ 184. Dexter determined that Lund had a history of drug abuse and had last used heroin and methadone on September 18, 2012. *Id*. ¶ 186. Dexter noted no redness or deformity, and Lund made no other complaints of injuries. *Id*. ¶ 187. The only positive symptom that Dexter found was an expression of pain when he palpated Lund's left back. *Id*. ¶ 188. Dexter noted that Lund was hyperventilating unless he was being spoken to, at which point he was able to control his breathing, leading Dexter to suspect that Lund was exaggerating his symptoms, although it was possible that Lund was hyperventilating due to pain. *Id*. ¶ 189. Lund did not make any complaint to Dexter of excessive force by a police officer – only that a police officer had injured him. *Id*. ¶ 190.

Lund was transported by ambulance to Maine Medical Center ("MMC"), where Jacob Crowell, M.D., ordered an x-ray of his chest under the direction of the attending emergency room physician, Matthew Hamonko, M.D. Plaintiff's Additional SMF ¶ 232; Defendant's Reply SMF ¶ 232.[20] The x-ray was unremarkable, including because there was no indication of a broken rib. Defendant's SMF ¶ 194; Plaintiff's Opposing SMF ¶ 194. However, the x-ray could not rule out a rib fracture. Plaintiff's Additional SMF ¶ 233; Defendant's Reply SMF ¶ 233.

Dr. Hamonko noted that Lund was in mild painful distress and that there was no significant trauma, including no abrasions, black and blue marks, swelling, or other indications of trauma. Defendant's SMF ¶ 191; Plaintiff's Opposing SMF ¶ 191. An MMC physician determined that Lund had "no deformity, no evidence of bruising, [or] contusion over the skin." *Id*. ¶ 192. The only positive finding Dr. Hamonko made with respect to Lund's medical complaint was tenderness on palpation of Lund's chest wall. *Id*. ¶ 194.

---

[20] My recitation incorporates McCusker's qualification.

On September 22, 2012, Henry Talarico, M.D., interpreted a computerized tomography ("CT") scan of Lund that was undertaken after Lund presented himself to the Mercy Hospital ("Mercy") Emergency Medicine Department with mild tenderness to the left flank area of his back, although no deformity of Lund's back was noted by the physician's assistant who examined him. *Id*. ¶¶ 34, 196. After reviewing Lund's CT scan, Dr. Talarico diagnosed an acute fracture to the posterolateral aspect of the left 10th rib, with no other remarkable determinations. *Id*. ¶ 197. This area was consistent with the original site of the alleged injury. Plaintiff's Additional SMF ¶ 235; Defendant's Reply SMF ¶ 235.[21] The x-ray and CT scan results are not inconsistent because the CT is a more sensitive instrument that can "slice through and see things without anything in the way." *Id*. ¶ 236.

Rib fractures are painful because there are many nerves in the bone structure. Defendant's SMF ¶ 198; Plaintiff's Opposing SMF ¶ 198. Lund expressed discomfort when Dr. Hamonko palpated his chest wall for diagnostic purposes. *Id*. ¶ 199. Application of a knee against the ribcage of an individual (*i.e.*, Lund) is similar to palpating the ribcage (and getting an expression of pain). *Id*. ¶ 200. A rib fracture is not necessarily the result of an application of extreme force to an individual's ribs; it could be caused by a sneeze, cough, or modest amount of force, including a modest amount of force applied by a knee leaning against an individual's ribcage. *Id*. ¶ 201. It is possible for an individual to sustain a rib fracture when falling, diving, or jumping to the ground. *Id*. ¶ 202.

Dr. Talarico is unable to offer an opinion as to whether the mechanics of the injury described by Lund are consistent with the fractured rib that he diagnosed. *Id*. ¶ 203. Dr.

---

[21] McCusker qualifies this statement, asserting that Dr. Hamonko cannot confirm that Lund had a broken rib when he came to MMC on September 19, 2012, and cannot determine whether the rib fracture diagnosed on September 22, 2012, occurred after Lund's visit to MMC on September 19, 2012, which is possible. Defendant's Reply SMF ¶ 235; Deposition of Matthew T. Hamonko, M.D. ("Hamonko Dep.") (ECF No. 33-7), attached to ECF No. 33, at 19, 22-23.

Talarico diagnosed Lund's rib fracture on September 22, 2012, but it is impossible for him to rule out the possibility that Lund's rib fracture occurred after he was examined at MMC on September 19, 2012. *Id*. ¶ 204.  Dr. Hamonko testified that he could not confirm that Lund had a rib fracture when he was examined at MMC on September 19, 2012, or rule out that the fracture occurred between that time and the time of Lund's examination at Mercy on September 22. *Id*. ¶ 205.  Dexter and Dr. Hamonko testified that they have examined patients who have expressed pain, discomfort, or injuries that they concluded had been feigned or exaggerated and that it was potentially done to facilitate a lawsuit. *Id*. ¶ 206.

Whenever an arrestee makes a claim of injury, Nevins is responsible for evaluating all of the evidence that he can gather regarding the incident, including the officer's description, available video evidence, and statements by officers, witnesses, and the arrestee. *Id*. ¶ 171. McCusker told Nevins that he shifted his weight because Lund complained when McCusker leaned his knee on Lund's back. *Id*. ¶ 173.  Over the course of his investigation, in addition to interviewing McCusker, Nevins interviewed Lund and, on three occasions, examined the area of Lund's back that Lund claimed had been injured: at the scene of detention, in the MEDCU ambulance, and at MMC (allowing time for bruising to develop). *Id*. ¶ 174.

Nevins, a licensed EMT, did not see any redness, bruising, or other indications that Lund had been injured. *Id*. ¶ 175.  In the circumstances, Nevins would have expected to see some redness or abrasion where an injury had occurred.  Defendant's SMF ¶ 176; Deposition of Eric Nevins ("Nevins Dep.") (ECF No. 33-5), attached to ECF No. 33, at 20.[22]  Nevins believed that, if someone had stomped on Lund's back with a knee, there would have been visible injuries when he examined Lund's back.  Defendant's SMF ¶ 177; Plaintiff's Opposing SMF ¶ 177.

---

[22] Lund denies this statement, but his assertion is in the nature of a qualification: that Dr. Hamonko testified that it was not unusual for someone to have a broken rib and no ecchymosis or swelling.  Plaintiff's Opposing SMF ¶ 176; Hamonko Dep. at 40-41.

Nevins concluded that the physical appearance of Lund's body belied his claim of injury. *Id*. ¶ 178.

Regardless of the absence of any visible injuries and Nevins' belief that Lund had an ulterior motive that explained what Nevins thought was an incongruity between his purported injury and the level of his complaint, Nevins completed his investigation, including obtaining photographs of Lund's back and preparing a use of force report and analysis. *Id*. ¶ 179.  Officer Les Smith photographed Lund, including his rib area, in the ambulance at the arrest scene as part of the protocol for a use of force evaluation. *Id.* ¶ 180.  The photographs taken of Lund's back in the MEDCU ambulance showed no visible marks (including no abrasions, scrapes, bruising, redness, or contusions).  *Id*. ¶ 181.   Out of an abundance of caution, Nevins concurred with MEDCU's decision to take Lund to MMC for further examination, where he was evaluated again without finding an explanation for his complaint.  Defendant's SMF ¶ 182; Nevins Dep. at 16-17; Hamonko Dep. at 14-15, 17-18.[23]

Dr. Hamonko testified that there was nothing inconsistent about a fractured rib and a lack of swelling or ecchymosis or abrasions.  Plaintiff's Additional SMF ¶ 237; Defendant's Reply SMF ¶ 237.[24]  A rib fracture is particularly painful because of movement in the chest.  *Id*. ¶ 247.  "If your arm was broken, you could stop moving it, but you can't stop moving your lungs."  *Id*.

Lund did not file an internal affairs complaint against McCusker for almost a year. Defendant's SMF ¶ 207; Plaintiff's Additional SMF ¶ 207.

---

[23] Lund denies this statement, but his assertion is in the nature of a qualification, which is set forth elsewhere in my recitation of facts.  Plaintiff's Opposing SMF ¶ 182.

[24] McCusker qualifies this statement, asserting that, in the cited portion of Dr. Hamonko's deposition, he was testifying generally about whether it is possible to have an absence of swelling, ecchymosis, or abrasions despite a diagnosis of a rib fracture, whereas Lund claims that McCusker attacked him extremely violently with his knee. Defendant's Reply SMF ¶ 237; Hamonko Dep. at 41; Lund Dep. at 78, 105, 112.

At his deposition, McCusker denied the punch and the knee strike, while acknowledging that throwing a punch on a defenseless, compliant individual would be illegal and criminal. Plaintiff's Additional SMF ¶ 238; Defendant's Reply SMF ¶ 238.  He acknowledged that both suspects were very compliant from the outset.  *Id.* ¶ 239.  McCusker acknowledged that he might have used profanity, even though it would have been inappropriate and there was no resistance to his actions or commands.  *Id.* ¶ 240.  He denied any connection between profane language such as "I'll cave your f_ _king face in" and assaultive behavior.  *Id.* ¶ 241.[25]  He acknowledged that he sometimes uses profanity during arrests, calling it a "poor choice of words."  *Id.* ¶ 242.  He acknowledged making poor choices, but only in words, not actions.  *Id.* ¶ 243.

When asked to explain the positioning of his left knee against Lund's back, McCusker maintained that he placed the knee on the shoulder area and that he was squatting, never using full force.  *Id.* ¶ 244.[26]  On cross-examination, he denied that there was any difference between his statement to Internal Affairs that his knee was "just above the belt line" and his testimony that he placed his knee on the shoulder area, although he acknowledged that the rib cage and the upper torso/shoulder are not in the same place.  *Id.* ¶ 245.[27]  He went on to declare that "just above the belt line is everything above the belt line, including the head."  *Id.* ¶ 246.[28]

### E.  Knee Strike *Versus* Knee Stabilization Technique

A knee strike is a pain compliance technique that involves the use of a knee against a large muscle group, such as a thigh, where there is a concentration of nerves, in order to distract

---

[25] McCusker qualifies this statement, asserting that he testified that he did not make the quoted statement and that he did not agree in this context, that is, with respect to his conduct in these circumstances, that poor choices of words sometimes lead to poor choices of actions.  Defendant's Reply SMF ¶ 241; McCusker Dep. at 42-43.

[26] My recitation incorporates the salient portion of McCusker's qualification.

[27] McCusker qualifies this statement, asserting that he testified that he uses the "belt line" as a frame of reference, meaning "the area above the belt line as opposed to the area below the belt line," which is a clear point of demarcation.  Defendant's Reply SMF ¶ 254; McCusker Dep. at 86-87.

[28] McCusker qualifies this statement, asserting that it is incomplete, in that he testified that "[j]ust above the belt line is everything above the belt line, including the head, the shoulders and the back is above the belt line; below the belt line would be buttocks, quads, calf, feet."  Defendant's Reply SMF ¶ 255; McCusker Dep. at 87.

a resisting suspect so that the officer can gain control of the suspect's arms for handcuffing. Defendant's SMF ¶ 43; Plaintiff's Opposing SMF ¶ 43.  A police officer's use of a knee strike against a resisting suspect is different from an officer's use of a knee to stabilize a suspect who is being searched and handcuffed.  *Id.* ¶ 44.  A police officer uses the knee stabilization technique to keep a suspect from rolling over or getting up on his/her knees, which would be telegraphed to the officer's knee, whereas a knee strike is a powerful blow that could cause a substantial amount of injury depending on how it is delivered.  *Id.* ¶ 45.

A reasonable officer may use a knee to stabilize a prone suspect when handcuffing and/or searching the suspect due to safety concerns.  *Id.* ¶ 46.  A reasonable officer who uses a knee to stabilize a prone suspect when handcuffing and/or searching the suspect would keep his/her feet on the ground and evenly distribute his/her weight on both feet so that the officer could react quickly if the suspect began to struggle with the officer.  *Id.* ¶ 47.  An officer using a knee to stabilize a suspect being searched and handcuffed is in a crouched position when applying a lower knee and/or upper shin to an area of the suspect's body ranging from the calf to the thigh to the lower back or shoulder, depending on the circumstances.  *Id.* ¶ 48.

The standard police procedure for stabilizing a prone suspect with a knee involves the officer keeping most of his or her weight on the balls of the feet so that the knee can be used to apply more or less pressure to control the suspect's movement if necessary, or so that the officer can pull back, take cover, or respond otherwise to sudden resistance.  *Id.* ¶ 49.  Stickney generally does not put all of his weight on one foot or knee because it would inhibit his ability to move.  *Id.* ¶ 50.  Although he had used his knee to stabilize a prone suspect many times prior to September 19, 2012, Nevins did not recall injuring any suspect while doing so.  *Id.* ¶ 52.  Nevins

did not recall a specific incident when an officer using a knee to stabilize a non-resisting prone suspect caused an injury.  *Id*. ¶ 53.

McCusker and Stickney had probable cause for the arrests of Lund and Staples.  *Id*. ¶ 54. Lund, along with Staples, admittedly lied to the police officers at the outset of their encounter by saying that they had merely been walking along the railroad tracks.  *Id*. ¶ 159.  They also admittedly lied early in the encounter by saying that they had hollered at some men driving by in a vehicle and then ran away when the vehicle turned around on them.  *Id*. ¶ 160.  After the police found a set of cable cutters near Lund's and Staples' hiding place and an officer told them that they were suspected of planning a burglary at the CMP property, Lund, along with Staples, denied that they were burglars and told the police officers that they had come to the area to buy heroin, not to commit a burglary at CMP, and that they had been running away from some African American heroin dealers after the drug deal went bad.  *Id.* ¶ 161.  Staples ultimately pleaded guilty to possession of burglary tools.  *Id*. ¶ 162.

### III.  Discussion

### A. The Governing Law

### 1. The Fourth Amendment

The Fourth Amendment provides that the federal government shall not violate "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures[.]"  U.S. Const. amend. IV.  For constitutional purposes, a "seizure" occurs whenever a state actor "restrains the liberty of a person" through "physical force or a show of authority."  *Estate of Bennett v. Wainwright,* 548 F.3d 155, 167 (1st Cir. 2008).

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard."  *Plumhoff v. Rickard,* __ U.S.

__, 134 S. Ct. 2012, 2020 (2014).  To determine whether an officer used excessive force in a given case, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan v. Cotton,* __ U.S. __, 134 S. Ct. 1861, 1865 (2014) (citation and internal quotation marks omitted).

"This reasonableness inquiry is an objective one; it is not a question of subjective intent." *McGrath v. Tavares,* 757 F.3d 20, 25 (1st Cir. 2014).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citation and internal quotation marks omitted).  The inquiry is conducted "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citations and internal quotation marks omitted).  It "must account for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 25-26 (citation and internal quotation marks omitted).  "[N]ot every push or shove will reach the level required for an actionable excessive force claim[.]" *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011) (citation and internal quotation marks omitted).

Courts applying the excessive force reasonableness test consider, among other factors, "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Raiche v. Pietroski,* 623 F.3d 30, 36 (1st Cir. 2010) (citation and internal quotation marks omitted).  However, the critical judgment must be made in light of the "totality of the circumstances," not through mechanical application of a multi-factor

21

test.  *Plumhoff,* 134 S. Ct. at 2020.  "[I]n the end we must still slosh our way through the factbound morass of 'reasonableness.'"  *Scott v. Harris,* 550 U.S. 372, 383 (2007).

### 2. Section 1983 and the Qualified Immunity Doctrine

Section 1983 allows a plaintiff to bring a claim for redress against any person acting under color of state law who subjects him or her or causes him or her to be subjected to a deprivation of "rights, privileges, or immunities secured by the Constitution," including the Fourth Amendment's protection against unreasonable seizures.  42 U.S.C. § 1983.  However, under the doctrine of qualified immunity, "police officers are protected from liability for civil damages" under section 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mlodzinski,* 648 F.3d at 32 (citations and internal quotation marks omitted).  The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation[,]" *Hunter v. Bryant,* 502 U.S. 224, 227 (1991), given that the doctrine confers "an immunity from suit rather than a mere defense to liability[,]" *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis omitted).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry."  *Tolan,* 134 S. Ct. at 1865.  "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right."  *Id.* (citation and internal punctuation omitted).  "The second prong . . . asks whether the right in question was clearly established at the time of the violation."  *Id.* at 1866 (citation and internal quotation marks omitted).  "Courts have discretion to decide the order in which to engage these two prongs."  *Id.*  "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Id.*

Qualified immunity protects government actors "who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." *Camilo-Robles v. Zapata*, 175 F.3d 41, 43 (1st Cir. 1999). "The doctrine of qualified immunity leaves ample room for mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Berthiaume v. Caron*, 142 F.3d 12, 15 (1st Cir. 1998) (citation and internal quotation marks omitted).

The constitutional prohibition against the use of excessive force has long been clearly established. *See, e.g., Morelli v. Webster*, 552 F.3d 12, 23-24 (1st Cir. 2009) (describing the law in this area as "crystal clear").

### B. Analysis

McCusker seeks summary judgment as to Lund's excessive force claim on the bases that Lund failed to supply significantly probative evidence that McCusker used a knee strike and, in any event, the record belies his allegation as to the mechanics of his rib injury. *See* Motion at 2-3.

I conclude that there are triable issues of material fact as to whether McCusker used excessive force against Lund.

First, as noted above, I conclude that Lund's evidence as to what he perceived, including what he heard and sensed, is competent evidence in support of his version of events. McCusker's objections to that evidence go to its weight – Lund's credibility – and not to its admissibility. McCusker adamantly denies that he threatened or used excessive force against either Staples or Lund on the night of September 19, 2012. However, at this stage of the proceedings, the cognizable evidence must be viewed in the light most favorable to Lund. A

23

trier of fact crediting Lund's evidence could conclude that, while he and Staples were handcuffed and compliant, McCusker swore at and threatened both suspects, punched Staples in the face, and then delivered a knee strike to Lund (rather than simply using a knee stabilization technique to facilitate the search, as McCusker asserts). Three days later, Lund was diagnosed with a broken rib. This is sufficient, if Lund's testimony is credited, to show an excessive use of force against the compliant and handcuffed Lund.[29]

McCusker characterizes Lund's evidence that he (McCusker) punched Staples and used profanity and threats of force as "red herrings[,]" given that Staples no longer is a plaintiff in this lawsuit and profanity and threats of force are not, in themselves, actionable. *See* Officer McCusker's Reply to Edward Lund's Response to the Motion for Summary Judgment ("Reply") (ECF No. 36) at 4-6. Yet, while McCusker's alleged conduct toward Staples, profanity, and threats of force are not in themselves dispositive, they are relevant in assessing whether, in the totality of the circumstances, Lund has presented a triable case of excessive force.

Second, the medical evidence does not undermine Lund's claim. It is inconclusive. Neither Dr. Talarico nor Dr. Hamonko could definitively rule out that Lund's rib fracture, as documented on September 22, 2012, occurred on September 19, 2012, in the manner in which Lund says it did. While it is certainly possible that Lund could have fractured his rib while "diving" for cover prior to the police encounter, as a result of which Lund felt pain with the relatively modest knee pressure that McCusker asserts he used, it is not, as McCusker argues, "the only *reasonable* inference" regarding the mechanism of injury. Motion at 13-14 (emphasis in original). It is also possible, as McCusker points out, that Lund broke his rib after his

---

[29] McCusker asserts that Lund admitted that, when Lund complained of pain, he (McCusker) shifted his knee to make Lund more comfortable, establishing that McCusker responded with an effort to relieve Lund's pain, not hurt him. *See* Motion at 2-3, 12-13. However, Lund denies this. *See* Plaintiff's Opposing SMF ¶ 146. While Lund also alleges that McCusker's knee moved, he asserts that it did so only because of the force and weight used to deliver the alleged blow. *See* Plaintiff's Additional SMF ¶ 224.

encounter with police and prior to his CT scan on September 22, 2012. *See id.* at 14-15. But, again, it is not clear that he did.[30]

The question of whether McCusker employed excessive force against Lund on the evening of September 19, 2012, accordingly, remains one for decision by a jury.

## IV. Conclusion

For the foregoing reasons, McCusker's motion for summary judgment as to Lund's sole remaining claim, for excessive force in violation of the Fourth Amendment, is **DENIED**.

Dated this 20th day of April, 2015.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[30] Each party draws my attention to evidence bearing on the other's credibility, including McCusker's evidence that Lund admitted that he lied to the officers at the outset of their encounter and later falsely stated that he saw McCusker punch Staples. *See* Opposition at 17; Reply at 2-3 n.2. This only underscores the fact that there are triable issues in this case. *See Advanced Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH*, __ F.3d __, No. 12-2007, 2015 WL 1283906, at *4 (1st Cir. Mar. 20, 2015) (Courts "are not to make credibility determinations or weigh the evidence in determining whether summary judgment should be granted.") (citation and internal quotation marks omitted).